UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

CESAR DENIS,

Defendant.

Case No. 18-cr-20426

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

_____/

## OPINION AND ORDER REGARDING CALCULATION OF LOSS UNDER U.S.S.G. § 2B1.1 *ET SEQ.* AND DETERMINING RESTITUTION [#44][#46]

### I. INTRODUCTION

On June 20, 2018, Defendant Cesar Denis was charged in a one-count Information for Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349. ECF No. 1. On August 23, 2018, Defendant entered a guilty plea to Count I of the Information. ECF No. 11. He also entered into a cooperation agreement with the United States. Defendant's continued sentencing hearing is set for May 24, 2021.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On August 23, 2018, Defendant entered a guilty plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). ECF No. 11. The factual basis for Defendant's guilty plea included:

Beginning in or around November 2013 and continuing through in or around April 2016, in the Eastern District of Michigan, Defendant Cesar Denis willfully conspired with others to commit health care fraud, in violation of 18 U.S.C. § 1349. Medicare is a "health care benefit program" of the United States, as defined in 18 U.S.C. § 24(b).

Defendant is a licensed physical therapist. Defendant worked at Anointed Care Services LLC ("Anointed"). Anointed was a home health care agency that billed Medicare for services, including skilled nursing and physical therapy, purportedly provided to homebound Medicare beneficiaries. Medicare pays for home health services only if the services are medically necessary, actually provided, and not procured through the payment of kickbacks or bribes.

While working at Anointed, Defendant and others agreed to pay, and paid, Medicare beneficiaries in exchange for their signatures on documents, including blank home health visit notes, that enabled Anointed to bill Medicare Defendant and others agreed to fabricate, and fabricated, medical records, including pre-signed physical therapy visit notes, to show that services were medically necessary and provided to Medicare beneficiaries. In fact, the services documented on the visit notes were procured through the payment of illegal kickbacks and bribes, were medically unnecessary, and were not provided.

Defendant and his co-conspirators agreed to, and did, submit and cause the submission of claims to Medicare for services that were procured through the payment of illegal kickbacks and bribes, were medically unnecessary, and were not provided.

From November 2013 through April 2016, Anointed billed Medicare approximately $1,702,999, and Medicare paid Anointed approximately $1,593,804.

The preceding statement is a summary made for the purpose of providing the Court with a factual basis for Defendant's guilty plea to the charge against him. It does not include all of the facts known to Defendant concerning criminal activity in which he and others engaged. Defendant makes this statement knowingly and voluntarily and because he is in fact guilty of the crime charged.

ECF No. 11, PageID.34–36. The Rule 11 Plea Agreement noted the parties' dispute concerning "application of [U.S.S.G.] section 2B1.1(b)(1)" to the circumstances of this case. *Id*. at PageID.36 ("The Government's position is that section 2B1.1(b)(1)(H) applies (loss is more than $550,000 and less than $1,500,000), and the Defendant's position is that section 2B1.1(b)(1)(D) applies (loss is more than $40,000 and less than $95,000)."). *Id.* As such, the Government claimed the Defendant's guideline range is 37-46 months of imprisonment based on the loss amount of $806,502. *Id*., PageID.37. Conversely, Defendant's position was that his guideline range was 12-18 months based on the loss amount of $40,000 and $95,000. *Id*.

In the Sentencing Memoranda, the parties reassert their dispute concerning the correct calculation of loss. On August 25, 2020, the Court began Defendant's sentencing hearing on this presented issue. ECF No. 35. At the August 25, 2020 hearing, Timothy Coughlin of UHY Advisors, LLC, a certified public accountant, provided expert testimony in the field of accounting in support of Defendant's position on the proper calculation of loss. The August 25, 2020 hearing was continued to September 8, 2020. ECF No. 40.

At the continued September 8, 2020 sentencing hearing, Special Agent Michael Pemberton from the U.S. Department of Health and Human Services testified about his investigation of the Anointed conspiracy in support of the

Government's loss amount theory. *See* ECF No. 41, PageID.597–679. Agent Pemberton testified that he was the Case Agent assigned to the investigation and interviewed roughly ten patients who were associated with Defendant. *Id.* at PageID.596, 598, 604. Counsel for Defendant objected to Agent Pemberton testifying to the statements made by these patients. *Id.* at PageID.603. Counsel for Defendant argued that he had never been provided with any statements from these patients. *Id.* The Court overruled counsel's objection. *Id.*

At the conclusion of the hearing, the Court ordered the parties to submit ten-page supplemental briefing as to the proper calculation of loss in this matter by September 15, 2020.[1] ECF No. 41, PageID.684–85. The Government timely submitted its brief on September 29, 2020. ECF No. 43. Defendant submitted his brief on October 1, 2020. ECF No. 44.

On April 30, 2021, Defendant submitted an Addendum to his aforementioned brief. ECF No. 46, PageID.717. In his Addendum, Defendant seeks to exclude Agent Pemberton's September 13, 2020 testimony from this Court's consideration of the proper loss amount. *Id.* at PageID.719. The Government filed a Response to the Addendum on May 5, 2021. ECF No. 47.

### III. LAW & ANALYSIS

#### A. *Brady v. Maryland* (ECF No. 46)

---

[1] The parties submitted a Stipulation to extend this deadline to September 29, 2020. ECF No. 42.

In his recently filed Addendum, Defendant argues the Government—through Agent Pemberton's impermissible testimony—"attempted to introduce into this critical stage of the proceedings" evidence concerning Defendant's role in the conspiracy—as early as 2013—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant argues evidence concerning Agent Pemberton's patient interviews and their statements were not disclosed at the time he entered his guilty plea. Therefore, Defendant argues that the Court should not rely on Agent Pemberton's testimony in determining the proper loss amount.

As an initial matter, the Government denies suppressing any evidence. Since entry of his guilty plea, the Government has twice offered to make additional discovery available, regardless of whether the Government relied on it to support its loss calculation. Defendant's counsel has only asked to see statements from patients Porter and Warren, neither of whom were interviewed by Agent Pemberton. Additionally, the Court notes for the record that it informed Defendant of his rights and the possible consequences of a guilty plea and verified that he understood those rights at the August 2018 plea hearing. ECF No. 14, PageID.76-89.

The Court also notes that Defendant's *Brady* argument is likely foreclosed by the entry of his guilty plea. *See United States v. Wells*, 260 F. App'x 902, 903 (6th Cir. Jan. 24, 2008) (citing *McCarthy v. United States*, 394 U.S. 459, 466

(1969)). However, the Court need not resolve whether Defendant's *Brady* argument is foreclosed by his guilty plea because there is no basis to exclude Agent Pemberton's testimony. Here, no *Brady* evidence is at issue here because Defendant cannot show the patient interview statements are (1) exculpatory, or (2) material. *See Strickler v. Greene,* 527 U.S. 273, 281–82; *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994); *Kyles v. Whitley*, 514 U.S. 4199, 433–34 (1995).

Defendant has not demonstrated any of the purportedly withheld discovery would have been favorable to his position that he was only involved in the Anointed conspiracy from February 2015 to September of 2015. Nor has he established that had the patient interview statements been produced prior to entry of his guilty plea, the result of the proceeding would have been different.

At the time of his plea, Defendant was aware that he admitted to Agent Pemberton his involvement in the scheme within months of beginning his employment at Anointed. He also knew from his interviews with Agent Pemberton that the Government had collected a large amount of incriminating evidence of his involvement in the scheme confirming these admissions. This evidence includes, but is not limited to, co-defendant Liberty Jaramillo's ledger, Defendant's activity logs, bank records, and payroll records.

For instance, at the September 20, 2017 interview, Defendant admitted Ed Hunt was his patient and that he paid Hunt kickbacks. ECF No. 33-4, PageID.267.

Agent Pemberton's records, which were shown to Defendant during the interview, confirm that this occurred as early as July of 2014.  ECF No. 33-2, PageID.254.

Agent Pemberton also testified that another patient associated with Defendant was Ernest Terry, who worked as a driver for Anointed.  ECF No. 41, PageID.624–25.  He further testified that Terry would drive other Anointed patients to and from appointments.  *Id.*  Agent Pemberton explained that Terry's case was interesting because he was obviously able bodied as an employee driver at Anointed.  *Id.*  Yet, Defendant knew Medicare was being billed for his purported physical therapy services for Terry.  Defendant also knew Terry was ineligible because he was not homebound.  *Id.*

Agent Pemberton's records confirm Defendant's admissions that his treatment of Terry began as early as March of 2014.  ECF No. 33, PageID.253. His records also contain copies of checks drawn from Anointed's bank account to Defendant.  The checks show Defendant received compensation in the form of kickbacks, referred to by the conspirators as "marketing or mktg."  ECF No. 33-13, PageID.391.

Thus, Defendant cannot show he would have insisted on proceeding to trial when he had knowledge of this additional evidence against him.  For all of these reasons, Defendant's eleventh hour *Brady* argument is without merit.  The Court

will therefore consider Agent Pemberton's testimony in determining the proper loss amount.

## B. Calculation of Loss (ECF No. 44)

As indicated above, the parties disagree on the amount of loss attributable to Defendant pursuant to U.S.S.G. § 2B1.1(b). Section 2B1.1 of the Sentencing Guidelines requires a sentencing court to increase a defendant's offense level based on the amount of monetary loss attributable to his crimes. Loss is typically "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A); *see also United States v. Healy*, 553 F. App'x 560, 565 (6th Cir. 2014). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A). "Intended loss" is defined, in relevant part, as "the pecuniary harm that was intended to result from the offense." *Id.*

To reiterate, the Rule 11 Plea Agreement reads, in part:

The Government's position is that section 2B1.1(b)(1)(H) applies (loss is more than $550,000 and less than $1,500,000), and the Defendant's position is that section 2B1.1(b)(1)(D) applies (loss is more than $40,000 and less than $95,000).

\* \* \* \*

The Government recommends that the Defendant's guideline range is 37-46 months of imprisonment … This is based on a loss amount of $806,502, which is the total amount that Anointed billed Medicare for home health services purportedly provided to Medicare beneficiaries for whom Defendant was the assigned physical therapist. This includes beneficiaries who were paid to sign blank visit notes, who were recruited through the payment of kickbacks and bribes, who did

not need health home services, and who never received the home
health services billed to Medicare. The Defendant recommends that
the Court determine his guideline range to be 12-18 months, based on
a loss amount between $40,000 and $95,000.

\* \* \* \*

Neither party may take a position concerning the applicable guideline
range that is different than any position of that party as reflected in
this agreement and in the attached worksheets, except as necessary to
the Court's determination regarding subsections (a) and (b), above.

ECF No. 11, PageID.36–38. Despite asserting in the aforementioned Plea

Agreement that the appropriate measure of loss is between $40,000 and $95,000,

and that the agreement specifies that neither party may take a position other than

those outlined, Defendant argues in his Sentencing Memorandum that the loss

amount is less than $10,000. ECF No. 29, PageID.192. The Government

maintains in its recent Memorandum Regarding Calculation of Loss that the proper

calculation of loss in this matter is $806,502. ECF No. 43, PageID.693.

According to the Government, this amount is equal to the full extent of loss

intended by the Anointed conspiracy to which Defendant was a party. For the

reasons that follow, the Court agrees.

A district court must "make particularized findings with respect to both the

scope of the defendant's agreement [to engage in jointly undertaken criminal

activity] *and* the foreseeability of his co-conspirators' conduct before holding the

defendant accountable for that conduct." *United States v. Donadeo*, 910 F.3d 886,

899 (6th Cir. 2018) (citation omitted) (alterations and emphasis in original); *see also United States v. Martinez-Lopez*, 747 F. App'x 326, 334 (6th Cir. 2018). As to the scope of Defendant's involvement in the instant conspiracy, Defendant has admitted that between November 2013 and continuing through in or around April 2016 that he "willfully conspired with others to commit health care fraud, in violation of 18 U.S.C. § 1349."[2] ECF No. 11, PageID.34. The Sixth Circuit has found that the "scope" requirement is satisfied by a finding that the matter "was a jointly undertaken criminal activity" and on the fact that a defendant "has pleaded guilty to a conspiracy count." *United States v. Labib*, 38 F. App'x 257, 261 (6th Cir. 2002). The Government helpfully summarizes Defendant's admissions to federal agents during the course of the investigation in its Sentencing

_____

[2] Defendant argues in his Sentencing Memorandum and in his recent Memorandum that he was alternatively a member of the conspiracy between February and September 2015. *See* ECF No. 44, PageID.704 ("Mr. Denis identified that he participated within the phantom visits in 2015 from mid-February through mid-September."). As the Government points out in its present Memorandum, Defendant admitted during a formal proffer to have joined the conspiracy within "weeks or months" of his employment at Anointed in November 2013. ECF No. 33-11, PageID.381. Moreover, as previously discussed in section III.A, *supra*, Anointed documents demonstrate that Defendant engaged in the kickback portion of the conspiracy prior to February 2015. ECF No. 33-14, PageID.393 (showing January 13, 2015 $120 cash expense "C/O CD," which demonstrates kickbacks delivered by Defendant to five patients); ECF No. 33-13, PageID.391 (providing a September 17, 2014 paycheck made out to Defendant from co-defendant Liberty Jaramillo evidencing payment to Defendant for kickbacks); *see also* ECF No. 41, PageID.620 (Agent Pemberton explaining that the earliest evidence of kickbacks paid by Defendant occurred on October 10, 2014 to patients Ashby and Willie Clark).

Memorandum. *See* ECF No. 33, PageID.236–37. As discussed above, Defendant first participated in an interview in September 2017, where he admitted to falsifying visit notes, including "stacks of pre-signed visit notes," at the direction of his co-conspirators, and estimated that he had been working with them since "the beginning of 2014." ECF No. 33-4, PageID.266. He then participated in a second interview, where he stated he began falsifying physical therapy visit notes within weeks or months of his employment with Anointed. ECF No. 33-11, PageID.381.

As to the foreseeability of Defendant's co-conspirator's conduct, the Government argues that it was foreseeable to Defendant that his co-conspirators "would also be falsifying visit notes for other services, providing other kickbacks, and continuing to bill Medicare for the medically unnecessary or non-existent services 'provided' to his patients." ECF No. 43, PageID.697. In its Memorandum Regarding Calculation Loss, the Government sets forth how Defendant could be in a position to foresee the intended loss of $806,502. As cited above, Defendant admitted in his two interviews with federal agents that his patients were not homebound (and therefore ineligible for home health care). ECF Nos. 33-4, 33-11. In these same interviews, Defendant admitted to paying kickbacks to his patients in exchange for their participation in the scheme. *Id.* Indeed, as pointed out in footnote 1, the Government provided a copy of a check

made out from the Anointed bank account to Defendant to demonstrate such kickbacks paid through him on or by September 17, 2014. ECF No. 33-13. Moreover, as explained *supra*, Defendant admitted to falsifying "stacks" of pre-signed visit notes soon after his employment with Anointed commenced. ECF No. 33-4, PageID.266.

As the Government points out in its present Memorandum, the Eleventh Circuit rejected a defendant's similar argument that his loss amount should be "limited to the billings for only his individual patients and his personal actions." *United States v. Moran*, 778 F.3d 942, 975 (11th Cir. 2015). There, the court held that the defendant "knew or should have known that most, if not all, of the patients … were ineligible for [services]." *Id.* The court emphasized that the case involved a jointly undertaken criminal activity, as is the case here. The Sixth Circuit similarly determined that the foreseeability factor was met where the defendant "knew what was happening and chose to join in the scheme anyway." *United States v. Donadeo*, 910 F.3d 886, 900–01 (6th Cir. 2018) (concluding that $2.6 million of loss of the entire $3.3 million  of loss was attributable to the defendant in light of his jointly undertaken criminal activity between 2009 to 2011).

Upon review of the parties' presented arguments, the Court finds that Defendant knew or could have reasonably foreseen that Anointed would bill and be paid by Medicare for the supposed services rendered as part of his participation

in the charged conspiracy. Accordingly, the Court finds that Defendant was in a position to foresee the intended loss of $806,502 as set forth in Exhibit A of the Government's Sentencing Memorandum. *See* ECF No. 33-2 (listing $806,502.26 as the amount Anointed billed to Medicare).

Additionally, the Court finds that Defendant's argument that there were legitimate services rendered to his patients, *see* ECF No. 44, PageID.708; *see also* ECF No. 29-5, PageID.216, is without merit. Under the Guidelines and Sixth Circuit precedent, the total amount that Medicare paid to Anointed is considered the loss amount unless Defendant can prove the "specific value" by which the loss amount should have been reduced. *United States v. Mahmud*, 541 F. App'x 630, 636 (6th Cir. 2013) (citation omitted); *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019). Here, Defendant only offered his expert's reading of Anointed's documents during the hearings in August and September 2020. Defendant attached his expert Timothy Caughlin's report to his Sentencing Memorandum, ECF No. 29-5, where Caughlin provides two skeletal tables of alleged "legitimate physical therapy visits" between 2013 and 2016. According to Caughlin, Defendant received $19,535 for legitimate physical therapy visits in 2015 and $5,855 for phantom visits.[3] ECF No. 29-5, PageID.216.

---

[3] In its Sentencing Memorandum, the Government responds to Defendant's attempt to meet his burden by asserting that Defendant "merely pointed out a small subset of claims that *are* part of the fraud (bills for services that were never rendered) and

Upon review of the submitted evidence and provided testimony, the Court finds the Defendant has failed to meet his burden to prove a specific amount by which the Government's reasonable proffered loss calculation, $806,502, should be reduced. By comparison, the defense counsel in *Mehmood*, *see supra*, obtained testimony from multiple therapists, nurses, and counselors regarding the legitimate medical services rendered to the home-bound patients. 742 F. App'x at 941.

Defendant's claim that his involvement in the conspiracy was only from February 2015 to September of 2015 is also without merit. Caughlin's opinion is based on Defendant's assertion that he marked "e" on his records to signify payments that were not for legitimate medical services. Caughlin concludes Defendant's failure to mark "e" on some of his records, evidences those services and corresponding payments were for legitimate purposes. Caughlin's testimony and findings in this regard are simply not supported by the record evidence.

In conclusion, the Summary of Denis Beneficiary Billings, Defendant's admissions to Agent Pemberton in 2017, Defendant's activity logs, Anointed's payroll and bank records, and co-defendant Liberty Jaramillo's ledger, attached as exhibits A, C, K through M to the Government's sentencing memorandum, as well as Agent Pemberton's September 8, 2020 testimony, demonstrate the intended loss

---

making no specific argument as to the remaining bills, whether they be tainted by kickbacks, whether those patients were eligible for home health care, or what the specific value of any such claims would be such that they could be subtracted from the total." ECF No. 33, PageID.239.

of $806,502 is the proper loss calculation amount. This is the amount Anointed billed to Medicare during the period of which Defendant participated in the presently charged conspiracy. Accordingly, the Court concludes that Defendant is within the $550,000-$1,500,000 range in U.S.S.G. § 2B1.1(b)(1)(H). This intended loss amount results in a +14 to Defendant's base offense level 6.

## C. Restitution

As a final matter, the Government requests that the Court order Defendant to pay restitution in the amount of $806,502, jointly and severally with his co-conspirators. ECF No. 33, PageID.226. Curiously, the Government does not provide a separate section in its Sentencing Memorandum addressing its request for restitution. By comparison, the Government argued a need to provide restitution to the victim of the offense as to other co-defendants in this case. More importantly, however, the Government in the other cases (e.g. *United States v. Liberty Jaramillo* and *United States v. Editha Manzano*) argued for the defendants to be ordered to pay restitution as to the actual losses for their offenses. Comparatively, the Government here is requesting restitution as to the amount Anointed billed to Medicare (the intended loss)—$806,502—rather than the amount Medicare paid to Anointed (the actual loss)—$725,716. ECF No. 33-2, PageID.259.

A district court "must base its order of restitution on actual losses." *United*

*States v. Riddell*, 328 F. App'x 328, 329 (6th Cir. 2009) (citation omitted); *see also United States v. Razalan*, 725 F. Supp. 2d 636, 641 (E.D. Mich. 2010) ("Under the Sentencing Guidelines restitution is limited to the government's actual loss…"). Indeed, the Sixth Circuit has explained that "[u]nlike the loss calculation under U.S.S.G. § 2B1.1, which can be based on intended loss, the restitution calculation can only be based on actual loss." *United States v. Healy*, 553 F. App'x 560, 567 (6th Cir. 2014) (citing *United States v. Simpson*, 538 F.3d 459, 465–66 (6th Cir. 2008)). The district court determines the amount of restitution by a preponderance of the evidence, and the Government has the burden of establishing the amount of loss. 18 U.S.C. § 3664(e).

Here, Medicare paid Anointed $725,716 despite being billed an amount of $806,502. Notably, the PSR makes the distinction between the intended loss of $806,502 and the actual loss of $725,716, which Medicare paid to Anointed for home health services allegedly provided to beneficiaries for whom Defendant was the assigned physical therapist. PSR ¶ 16. The PSR accordingly denotes that the victim of this offense, the U.S. Department of Health and Human Services, suffered a loss of $725,716.81. PSR ¶ 18.

In light of the Sentencing Guideline's directive that restitution be limited to the Government's actual loss, as well as the Court's prior orders regarding restitution as to Defendant's co-defendants, the Court orders Defendant to pay

restitution in the amount of $725,716, rather than the Government's suggested amount of intended loss of $806,502.

## IV. CONCLUSION

Accordingly, for the reasons articulated above, it is **ORDERED** that the proper calculation of loss in this matter is the intended loss of $806,502.

**IT IS FURTHER ORDERED** that Defendant pay restitution in the amount of $725,716.

**IT IS SO ORDERED.**

Dated:       May 24, 2021

s/Gershwin A. Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 24, 2021, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager